Louis W. SHERWIN

v.

The OIL CITY NATIONAL BANK, a national banking association, Paul H. Biery and George A. Breene, not individually, but as Executors under Last Will and Testament of Harry J. Crawford, Deceased, and Citizens Banking Company of Oil City, Pennsylvania, a corporation.

Civ. A. No. 334.

United States District Court
W. D. Pennsylvania.

June 29, 1955.

Judgment Affirmed Feb. 8, 1956.

See 229 F.2d 835.

Drayton Heard, Pittsburgh, Pa., John Mulder, Chicago, Ill., for plaintiff.

E. C. Breene, Leo M. Brewster, J. V. Frampton, William J. McFate, Oil City, Pa., William W. Knox, Erie, Pa., Robert M. Dale, Franklin, Pa., for defendants.

WILLSON, District Judge.

The complaint in this case is divided into two counts. The action in the first count is asserted against all defendants, that is, Oil City National Bank, Paul H. Biery and George A. Breene, as Executors under the Last Will of Harry J. Crawford, Deceased, and Citizens Banking Company of Oil City, Pennsylvania. The second count claims against the executors only. Plaintiff is a citizen of Illinois. The case is here under diversity as defendants reside and do business in this judicial district.

Separate motions to dismiss the complaint under Rule 12 of the Federal Rules of Civil Procedure have been filed by the defendant executors and by Citizens Banking Company. The motions will be considered together, however, as they raise the same question, that is, defendants contend that the complaint fails to state a claim upon which relief can be granted, Rule 12(b) (6), 28 U.S.C.

At the outset it is noted that Rule 8(a) (2) requires that a pleading shall contain a short and plain statement of the claim showing that the pleader is entitled to relief. This complaint alleges that Harry J. Crawford, deceased, during his lifetime resided in Emlenton, Venango County, Pennsylvania. He was President of the Citizens Banking Company of Oil City, in the same county, and was influential in the management and business policy pursued by that bank and by the Oil City National Bank, also in Venango County. It further avers in general language that the decedent was a large owner of the common capital stock of various public utility corporations, including Columbia Gas and Electric Corporation; Lone Star Gas Corpora-

tion; Western Public Service Corporation; and Columbia Oil & Gasoline Corporation, and that decedent was generally a successful banker and businessman. It alleges that from 1915 to 1928 plaintiff was the pastor of the Presbyterian Church situate in Oil City and did banking business with the Citizens Banking Company. Plaintiff says that in December, 1922, and prior thereto, as the result of the solicitation of dealers in common stocks, he invested funds in such securities as public utilities and oil and gas companies, and borrowed money from the Citizens Banking Company, pledging the stock purchased as collateral for his notes. The amount of such transactions is not indicated in the complaint, except that in 1928 plaintiff says that he had loans in the Citizens Banking Company of approximately $111,000. Plaintiff avers that in November of 1928 he had a personal conference with decedent at his office in Oil City National Bank and informed decedent of his desire to liquidate a sufficient amount of his stocks, held as collateral for his loans at Citizens Banking Company, preparatory to going to England to attend lectures at Oxford University. He avers that he told decedent that he wished to have his mind free from any supervision of the loan account during this period of study. Crawford's reply is the basis of plaintiff's claim and he alleges with respect to it, that:

> "* * * if plaintiff would not sell his stocks so held as collateral or pay the loans, decedent and other officers of Citizens Banking Company would take charge of the loan account and would protect the collateral, regardless of the location of plaintiff's residence. * * *"

Plaintiff says that by reason of the promises made to him by decedent, and the confidence and trust placed in him by virtue of decedent's experience and activity in business, and decedent's close familiarity with the corporation represented by the stocks used for collateral on plaintiff's loans, plaintiff refrained from selling any of the collateral and permitted the collateral to remain under the care and supervision of decedent and "* * * such other officers of the Citizens Banking Company as decedent might select * * *." Plaintiff avers that decedent accepted the supervision and management of the collateral and loan account of plaintiff. Plaintiff avers that he relied fully upon the representations and assurances of decedent, and did not liquidate his holdings of stock to pay his loans before leaving for England, and that he was out of the country from January 24, 1929, until August, 1930, when he returned. Plaintiff says that during the time he was absent and following his return, officers of the Citizens Banking Company had keys to his safety deposit box in that bank, and officers of the bank had full access to the contents belonging to plaintiff. He says that at the time of his departure for Oxford, he put in his safety deposit box a number of assignments of stock and powers of attorney signed in blank, and promissory notes signed in blank, and that while he was away, agents of the Citizens Banking Company opened the safety deposit box and used the promissory notes, but used none of the assignments of stock or powers of attorney. Plaintiff says that under his arrangement with decedent for the supervision of his financial affairs, the agents of Citizens Banking Company had authority to use both notes and transfer powers. Plaintiff says that decedent placed himself in a fiduciary relationship toward plaintiff, in respect to the loans and his collateral at Citizens Banking Company, whereby the decedent assumed the duty to manage plaintiff's affairs in the same manner as a man of ordinary business prudence would have managed his own affairs under similar circumstances and without interference from decisions or actions of decedent dictated from a desire to advance decedent's own business interests or the interests of Citizens Banking Company.

Plaintiff further says that, notwithstanding decedent's initial insistence that plaintiff's bank loans should not be reduced and his failure to see that they were reduced during 1929, decedent pursued during 1929, as to his own securities, a course of liquidation so that decedent was substantially free of debt in the summer of 1929, whereas decedent permitted plaintiff's loans to subsist until the stock market crash in October, 1929. Plaintiff avers, generally, that in the summer of 1929 the value of his collateral over and above the aggregate of his loans amounted to $320,000. Plaintiff avers that in the summer of 1929 he communicated with E. S. Rugh of the Citizens Banking Company and other agents of the bank, with reference to the status of his notes and the stocks held as collateral, and that on at least two occasions discussed with the officers of the bank the liquidation of a sufficient amount of his stocks to pay his loans and on each occasion plaintiff says that he was advised by the officers of that bank that his stocks were under the supervision and management of decedent and would not be sold without the latter's direction, and that at no time prior to October 23, 1930, was plaintiff advised by decedent or any of the officers or agents of the bank to sell his stocks.

Plaintiff avers that neither Crawford nor the bank sold any or part of the collateral until long after the market crash in the fall of 1929, when the value of the stocks had fallen substantially below the face amount of the notes of plaintiff for which the stocks were pledged.

An inquiry is pertinent here as to what decedent Crawford promised to do. For instance, at what point was Crawford to direct the sale of the stock? That is, was Crawford to realize a large profit, a small profit, or none at all, but see that plaintiff suffered no loss? If Crawford's duty was only to see that no loss occurred, that is, that the value of the stock would not fall below the amount of the notes, then such an obligation could have been expressed in clear language. If, on the other hand, considering that plaintiff had considerable value in the stocks, as he says he did, when was Crawford obligated to sell? Considering the language used on this phase of the transaction, one is left with uncertainty as to Crawford's undertaking in the transaction.

Professor Moore, in his discussion of Rule 8(a)(2), says (Vol. 2, page 1648 et seq.): "There is no requirement that the pleading state 'facts' or 'ultimate facts,' or 'facts sufficient to constitute a cause of action.'" He continues, page 1651: "The true test is whether the pleading gives fair notice and states the elements of the claim plainly and succinctly, and not whether as an abstract matter it states 'conclusions' or 'facts.'" He also says, page 1653: "Perhaps it is not entirely accurate to say, as one court has done, that 'it is only necessary to state a claim in the pleadings * * * and not a cause of action.' The pleading still must state a 'cause of action' in the sense that it must show 'that the pleader is entitled to relief'; it is not enough to indicate merely that the plaintiff has a grievance, but sufficient detail must be given so that the defendant, and the court, can obtain a fair idea of what the plaintiff is complaining, and can see that there is some legal basis for recovery." It is not necessary to set out the legal theory on which the claim is based, Siegelman v. Cunard White Star, 2 Cir., 221 F.2d 189, Gins v. Mauser Plumbing Supply Co., 2 Cir., 148 F.2d 974, but facts must be alleged to support a legal basis for relief.

For the purposes under discussion here, we follow the rule in Kroese v. General Steel Castings Corp., 3 Cir., 179 F.2d 760, 761, 15 A.L.R.2d 1117, where it is said: "On this state of the record we must assume, ad hoc, the truth of the allegations in the complaint." And if, under any view of it, the court

can grant any relief whatsoever, then the complaint in itself is sufficient. Garcia v. Hilton Hotels International, D.C., 97 F.Supp. 5. Rule 8(a)(3) requires that the complaint aver a demand for judgment for the relief to which plaintiff deems himself entitled. It is noted that the demand in this complaint, under Count 1, is that plaintiff demands judgment for an accounting from all of the defendants *of the losses* he sustained from breach of the fiduciary relation undertaken in respect to his financial affairs, and under the second Count, plaintiff demands judgment for an accounting from the executors *of the losses* he sustained from breach of the fiduciary relation undertaken in respect to his financial affairs. Plaintiff speaks of losses he sustained because of a breach. He does not demand the return of any specific personal property, but demands an accounting. The grievances complained of arise because of a breach followed by losses.

A careful study of the complaint fails to disclose the exact legal relationship alleged to have existed between the plaintiff and Citizens Banking Company, and the decedent Harry J. Crawford. As to the decedent, however, but not as to the bank, plaintiff alleges that a fiduciary relationship was created. He does not clearly aver whether the relief sought is based on a breach of contract or upon a breach of a legal duty between plaintiff and defendants, or either of them, which gives rise to an action sounding in tort. It is, of course, true that if there are sufficient facts in the complaint to support any one of such relationships, then it would follow that the complaint is sufficient, as the fair implication of the complaint is that plaintiff suffered losses.

▆▆▆▆ At the oral argument, plaintiff's counsel stated to the Court that he stood upon the proposition that the allegations in the complaint created an express oral trust between plaintiff and the decedent Crawford. An express trust is the general term used to denote a trust in the broad sense as differentiated from a resulting trust, a constructive trust, or a trust arising by operation of law. Perhaps the most important element of such a trust is the intent to create the trust. Such an intent must be properly manifested by the settlor in order to create the relationship. The manifestation of intent may be by written or spoken words or by conduct and no particular form of words or conduct is necessary for its creation. No consideration need pass from the trustee to the settlor. There must be delivery of property from the settlor to the trustee, constructive or actual, and the settlor may retain the power to revoke the trust in whole or in part and a power to modify the trust, but unless he reserves such power to control the trustee as to the details of the administration of the trust, then the trustee is his agent. See Restatement of the Law—Trusts, Secs. 23, 24, 26h, 29 and 32, and Bair v. Snyder County State Bank, 314 Pa. 85, 171 A. 274.

In speaking of a trust it is appropriate to point out that the Restatement, § 205, is entitled *Liability in Case of Breach of Trust,* and says: "If the trustee commits a *breach of trust* he is chargeable with: (a) any loss * * * etc." (Emphasis added.)

Directing attention then, to the complaint to determine whether the Court can obtain a fair idea of what the plaintiff is complaining, and can see whether there is some legal basis for recovery, the complaint is either in compliance with Rule 8(a)(2) or is, as a matter of law, insufficient.

In the first place, plaintiff says that he purchased and pledged stock as collateral for his loans at the Citizens. His obligations at one time were $111,000. He also says that in the summer of 1929 the value of the collateral over the indebtedness exceeded $300,000. With reference to the specific duty undertaken by Crawford, the language in the complaint is: "* * * decedent and oth-

er officers of Citizens Banking Company would take charge of the loan account and would protect the collateral, regardless of the location of plaintiff's residence." He also says that such supervision and protection was confirmed to plaintiff in a letter, but the letter is not attached to the complaint, nor is there a quotation from the letter. Plaintiff also says that Crawford did undertake supervision of plaintiff's loans and collateral. Plaintiff says, also, that decedent Crawford made representations and assurances that he would "always take care of" plaintiff and his collateral. The only element of a trust by Crawford apparent from the complaint is one of a duty to protect Sherwin's investments.

At the time that plaintiff received the assurances of decedent Crawford, plaintiff was dealing in securities in considerable volume and it is shown by the complaint that the Citizens Banking Company had a firm right to hold the securities or to sell them in the course of its business, depending upon their value with relation to the amount of the loans from day to day. As the Court understands it, plaintiff's position at the argument was that decedent Crawford, as President of the bank, had authority and defendant bank is thereby bound by Crawford's assurances to plaintiff that his collateral would be protected. It is believed that no liability can be fastened on the bank under the pleading on this point, because the basis for liability as to the bank is not plainly stated. It is doubtful that the plaintiff intended to aver that the bank, through decedent Crawford, relinquished any rights it held in the pledged collateral to the possible detriment of the bank's position, in order for Crawford to take charge of plaintiff's loan account and protect his collateral. The trust sought to be imposed by the complaint, if any, must have been superimposed upon the relationship already existing between plaintiff and the Citizens Bank. There is no averment warranting the conclusion that the bank, at any time, intended to recede or re-

tract from the pledgor-pledgee relationship between it and plaintiff, nor is there an averment that Crawford, as President, had any authority from the bank to alter or superimpose a trust upon such a contractual relationship, which existed between plaintiff and the bank, from the averment of the purchase of stock, the execution of notes and the collateral arrangement between plaintiff and the bank. The complaint lacks allegations of a trusteeship by the bank, and, equally important, it lacks allegations that the bank had fiduciary authority.

If the bank, as plaintiff urges, was in the position of trustee of the stock, it is at once apparent that such a relationship conflicts with the debtor-creditor situation which existed between the bank and the plaintiff. Such a relationship would not necessarily be fatal to the complaint, but if such a relationship did exist, it should be plainly stated. Plaintiff urges that the bank's interest in the collateral is consistent and harmonious with a fiduciary relationship of a trustee as to the same property. However, the complaint does not set forth the necessary facts to indicate that the bank agreed to, and did act both as trustee and pledgee.

More important to the disposition of the motions, however, are the averments as to the time of the events on which the complaint is based. Rule 9 (f) is clear. It says: "For the purpose of testing the sufficiency of a pleading, averments of time and place are material and shall be considered like all other averments of material matter." The time alleged commences in the year 1928, when plaintiff says that Crawford was a dominant force in Oil City business and banking circles toward support of a strong market for the common capital shares of certain corporations, voicing confidence in future prosperity and rising price potentiality to such an extent as to cause those securities to be referred to in Oil City as "Crawford

stocks." However, plaintiff says he commenced the purchase of stocks in December, 1922. Plaintiff says that in the spring of 1928 he had a personal conference with decedent, when the assurances commenced, and at which time his loans at the Citizens Banking Company were $111,000. Plaintiff says that decedent Crawford dissuaded him from selling his securities, and again on November 15, 1928, at another personal conference, decedent again persuaded plaintiff to refrain from selling his securities, and by reason of the confidence and trust reposed in decedent Crawford by plaintiff, and because of decedent's experience and activity in business, plaintiff refrained from selling any of the collateral. It is noted here that plaintiff left the country in January, 1929 and returned in August, 1930. What the *complaint fails to aver* as to what happened after August, 1930, when plaintiff returned to the country, is perhaps more indicative of the situation than what is averred. The point is that the complaint does not with exactitude set forth when plaintiff's losses occurred. Plaintiff seeks relief because of losses. There is no plain statement, however, as to the amount of the losses, or the time in which they were suffered. The fair implication from the complaint is that plaintiff's losses occurred during the stock market crash of 1929, and, if not at that particular time, within a couple of years thereafter. He says, paragraph 19, that defendant "permitted plaintiff's loans to subsist until the stock market crash in October, 1929, in the following overextended proportions. * * *" He says, paragraph 20, that at no time prior to October, 1929 was plaintiff advised by decedent or by Citizens' officers to sell any of his stock. He says, paragraph 21, that decedent failed to sell any of the collateral until long after the market crash of 1929, when the values of the stocks had fallen substantially below the face amount of the notes for which the stocks were pledged. He says that on April 2, 1931, decedent advised plaintiff that he (decedent) had sold enough of his own stocks in the summer of 1929 to become liquid. He says, also, that during the course of many conferences with decedent over the losses sustained by plaintiff, decedent led plaintiff to believe and plaintiff did believe, that reimbursement would be made to plaintiff before decedent's death. The Court takes notice of the stock market crash of October, 1929, and of the effect of the crash and of the economic conditions generally upon the value of common stocks for the subsequent three years, 1930, 1931 and 1932.

Under Rule 9(f), the time averred is material because in the motions to dismiss defendants say that it is obvious from the face of the complaint that any cause of action which plaintiff may have had has been long since barred by the statute of limitations of the Commonwealth of Pennsylvania. In Pennsylvania, generally speaking, suits based upon breach of contract must be commenced within six years. See 12 P.S. § 31 et seq. In an action sounding in tort the same statute of limitations applies. In the doctrine of laches, applicable in equity, or an action founded upon equitable principles, ordinarily the same period of time as the statute of limitations applies.

Certainly this complaint contains no plain statement of the time when the breach on the part of Crawford and the bank occurred, nor is there a statement tending to excuse plaintiff's failure or inability to fix the time. However, paragraph 21 of the complaint does say that the sale "* * * long after the market crash. * * *" was at a figure "* * * substantially below the face amount of the notes * * *." Thus, plaintiff concedes that the bank sold him out during or after the market crash. The stocks were pledged, and, as plaintiff says, they were sold at substantially below the amount of the notes. He concedes that there are no stocks left. Thus, any cause of action arose at that period of time. In the same para-

graph, plaintiff says that on April 2, 1931, decedent advised plaintiff of the sale of his own stocks in the summer of 1929. It is a fair implication from this paragraph, that plaintiff was aware of the sale of his own stocks by the bank at least by April 2, 1931. It follows then, if there was even an express oral trust, the corpus of the trust vanished and the purpose of the trust terminated at the time of the sale of the corpus of the trust at a figure substantially below the amount of the notes. A breach of the trust created thus took place at that time and any cause of action based on a trust relationship arose at that time.

On plaintiff's theory, expressed at oral argument, that an express trust was created, the doctrine of laches is applicable. See Shell v. Strong, 10 Cir., 151 F.2d 909, and McGrann v. Allen, 291 Pa. 574, 140 A. 552. It is conceded that the passage of time alone does not impose a bar because of laches. However, from 1931 at least until Crawford's death, November 3, 1953, a period of over twenty-two years, plaintiff asserted no action against the decedent or the defendant bank. The complaint speaks of verbal assurances and promises made by decedent Crawford. It is thus apparent that the passage of time has worked to the prejudice of the bank, and, of course, Crawford's executors.

Any cause of action which arose out of the transaction, whether it be on express contract or a tort action based on Crawford's or the bank's negligence in failing to sell until after the market crash, or whether it be based on a trust relationship, ripened at some point prior to 1932 and it follows that the statute of limitations applies and the doctrine of laches applies. Shell v. Strong, supra, and McGrann v. Allen, supra.

There is ample authority for the proposition that such defenses may be raised affirmatively or by motion when the facts averred in the complaint show that it is obvious that the statute applies. Rule 9(f) applies and also the following decisions: Suckow Borax Mines Consol. v. Borax Consolidated, 9 Cir., 185 F.2d 196; also Panhandle Eastern Pipeline Co. v. Parish, 10 Cir., 168 F.2d 238; and 2 Moore's Fed.Prac. (2nd Ed.), Sections 8.28, 9.07, 12.08 and 12.10.

Both motions to dismiss the complaint will be granted.